DOROTHY RUTH v. HUTCHINSON GAS COMPANY
AND OTHERS.
FRANCES SCHOENEMAN v. SAME.
LETHA G. SPANNAUS v. SAME.
FRANK H. JERGENS v. SAME.
JOSEPH H. JULIG v. SAME.[1]

January 24, 1941.

No. 32,411.

[1]Reported in 296 N. W. 136.

*W. E. Reyerson, Elmer C. Jensen, Fletcher, Dorsey, Barker, Colman & Barber,* and *Charles F. Noonan,* for appellants.

*J. D. Nunan* and *R. M. McCareins,* for respondents Hutchinson Gas Company, Emil Luedtke, and L. J. Rolander.

*Faegre, Benson & Krause, Paul J. McGough, Wright W. Brooks,* and *Joseph P. O'Hara,* for respondent Home Gas Company.

PETERSON, JUSTICE.

This appeal involves five cases in which recovery was sought upon the grounds of defendants' alleged negligence. Plaintiff Joseph Julig sues for personal injuries. The other four plaintiffs sue for the wrongful death of their respective decedents.[2]

Julig, Frank J. Ruth, Lyle H. Schoeneman, Walter M. Spannaus, and Lewis P. Jergens were friends. Some of them were businessmen, and the others held responsible business positions with firms at Hutchinson. In November, 1938, they arranged to go deer hunting near Big Falls in the northern part of the state. Each was to bring his own bedding, except the mattresses, and his arms and ammunition. Each contributed to a common fund or "kitty," of which Ruth was the custodian and out of which the expense of travel, food, and incidentals was to be paid. The testimony was that "each fellow had an equal voice in the running of the trip."

The five men planned to travel in a motor truck with a brooder house attached from Hutchinson to the place where they intended to hunt and to use the brooder house as their living quarters while they were hunting. Julig obtained the use of the brooder house from a lumber company and of the truck to which it was attached from his employer. The brooder house, as its name indicates, was a small structure such as is used by chicken raisers and was approximately 14 feet long, 8 feet wide, and 7 feet 4 inches high with a cubical content of about 600 feet. It had one door and five windows. There was a hole in the roof eight inches square to which a "smokestack" had been attached, but this had been knocked off by contact with the structure above the door of a garage into which the truck had been driven.

Julig arranged with the corporate defendants for heat and fuel. They loaned and installed without charge a Radiantfire heater, a cooking plate, and two drums of propane gas for fuel. They

[2]See Hutchinson Gas Co. v. Phoenix Ind. Co. 206 Minn. 257, 288 N. W. 847.

donated as much of the gas as was to be consumed on the trip. The only obligation on the part of the men was to return the equipment and the unused gas. All the equipment was of standard type, design, and construction, in good shape, and free from defects. No claim was made that there was anything wrong with the gas.

The equipment was installed at the plant of the corporate defendants, where the truck with the brooder house attached was taken for that purpose. The defendant Luedtke, manager of the Hutchinson Gas Company and in charge of the business of both corporations at Hutchinson, arranged for the gratuitous installation of the equipment and the gift of the gas to be used. The installation was made under his direction by the defendant Rolander, an employe who had been a gas service man for 15 years. He tested the equipment after it was installed and found it in good working order. He had made thousands of similar tests and had installed over 100 heaters, including three or four of the type here involved.

At the time of the installation there was the eight-inch square hole in the roof of the brooder house where the smokestack had been. During the progress of the work a tinsmith representing Julig and the other men measured the hole in the roof for the purpose of installing some sort of ventilator or cover. After the installation of the heating and cooking equipment the truck was driven away with the hole in the top of the brooder house unclosed. Later the tinsmith attached a cover over the opening which operated on a hinge and could be raised and lowered by means of a wire and kept open as desired by fastening the wire to a nail.

The heater had a collar to which a pipe or vent could be attached to carry off combustion gases or, as they were called, "flue products," but no such pipe was attached or installed. The evidence showed that Luedtke and Rolander knew that the burning of the gas gave off flue products, but that they did not know the

exact nature thereof or that, as it appeared here, the flue products consisted in part of carbon monoxide gas.

The heater had been used previously without a vent pipe with no injurious results. It had been sold to a customer who used it in his kitchen with propane gas as fuel during 1933 and 1934. Sometimes the kitchen door was closed and sometimes open. The customer returned the heater because he was in default on his payments. Thereafter the heater was installed without a vent pipe in the office of the Hutchinson Gas Company. The service was satisfactory and without ill effects in both instances, although the heater was not vented.

In the presence of all the men who went on the hunting trip except Spannaus, Rolander explained the use of the equipment to Julig. Rolander and other witnesses testified that he then instructed Julig to keep the brooder house well ventilated and to keep the door or a window open. This Julig positively denied.

Early on the morning of November 13, 1938, the hunting party left Hutchinson for Big Falls, which was some 300 miles distant. Two of them rode in the driver's seat and three of them in the brooder house attached to the truck. The heater was on all the way en route without any distressing results. The evidence does not show whether the roof ventilator was kept open en route or to what extent the brooder house was ventilated, except inferentially that the only ventilation was through cracks around the windows and an opening under the door. Apparently the windows and door were kept closed. Nor does the evidence show what the temperature, wind, or other atmospheric conditions were.

After reaching their destination the truck was parked. It was then cold, the temperature being below zero, and still. There was about six inches of snow on the ground. The heater was turned off while the men prepared their supper. After supper the heater was lighted again. The ventilator was kept open. The parties retired for the night with the heater burning. Julig, who slept alongside of a window where there was some draft, woke up during the night from nausea. There was evidence that he

attempted to communicate with his companions. Receiving no response, he assumed that they were sleeping soundly and went to sleep again himself.

On the morning of November 14, two game wardens opened the door of the brooder house and found Julig unconscious and the other four men dead. The ventilator had been shut and the windows and door of the .brooder house had been closed tight.

It was ascertained later that Julig's condition and the deaths of his four companions were caused by inhaling carbon monoxide gas given off by the heater while burning propane gas during the night.

Plaintiffs claimed that defendants were guilty of negligence in failing to install a pipe, vent, or other means to carry the carbon monoxide gas from the heater to the outside and in failing to warn Julig and the decedents of the carbon monoxide gas that would be given off by burning the gas in the heater and of the dangers incident thereto if the gases were not eliminated from the brooder house. The corporate defendants were charged as suppliers of the equipment and the gas and the individual defendants as agents and employes of the corporate defendants in accomplishing those purposes.

The evidence showed that the burning of propane gas in the heater gave off, among other flue products, carbon monoxide gas, which, because it had not been carried to the outside, freely circulated with the air inside. Carbon monoxide gas is colorless and to most people practically tasteless and odorless. Its effect upon the human system depends upon its density. A concentration of 1/15 of one per cent is dangerous to human life, 2/10 of one per cent is usually fatal, and one per cent is regarded as fatal within a very short time. The density of a particular concentration in a given place depends not only upon the amount of carbon monoxide gas produced there, but also upon the extent of the elimination of the carbon monoxide gas and the introduction of fresh air. There was no affirmative showing here as to the amount of carbon monoxide gas given off by the heater or the amount of fresh

air introduced through the roof ventilator, the opening under the door, and the cracks around the windows. Such means of ventilation proved sufficient while the party was en route from Hutchinson to Big Falls. There was not sufficient ventilation with the roof ventilator closed when the truck was at rest. The evidence does not show that there would have been sufficient ventilation if the roof ventilator had been kept open during the night, but an inference of the affirmative is permissible in view of the fact that no member of the party experienced any ill effects or distress while the ventilator was kept open.

The case was submitted below so far as defendants' alleged negligence was concerned on the theory advanced by plaintiffs. The jury was instructed that a finding of negligence was permissible if defendants as the suppliers of the chattels used and consumed failed to exercise reasonable care to inform Julig and the decedents, if the defendants knew or from facts known to them should have realized, that the chattels were or were likely to be dangerous for the use for which they were supplied. Further, the charge was that it was the duty of defendants to know the qualities of the gas supplied and the dangers incident to its use. The question of contributory negligence was also submitted. The court further charged that if the parties were engaged in a joint adventure each was chargeable with the acts and omissions of the others. There was a verdict for defendants. Plaintiffs appeal from the order denying their motion in the alternative for judgment notwithstanding the verdict or for a new trial.

Here, the plaintiffs urge that the evidence compels a finding of negligence on the part of defendants. They contend with respect to the question of negligence that defendants were under a legal duty of knowing that burning the gas in the heater would give off carbon monoxide gas with danger to the life and health of plaintiff Julig and the decedents and of warning them of such dangers, and that defendants did not discharge that duty for the reason that "the defendants knew *nothing* about the propensities of their gas and knew *nothing* about carbon monoxide being formed in its

combustion, and hence could not and did not warn of the danger." They contend that the evidence does not support a finding of either contributory negligence or joint enterprise and hence that it was error to submit those questions to the jury.

■ We shall assume, as the parties apparently have done, that the same rules apply to both the individual and corporate defendants with respect to liability. Since negligence consists of breach of duty to the injury of another, it is of the first importance to determine what duty the defendants owed to Julig and the decedents. The legal duty in the particular situation prescribes the measure of care to be exercised by the party charged with negligence. Having determined the legal duty of the defendants, the next thing is to determine whether that duty was breached in the respect claimed by the plaintiffs.

The charge of negligence is based upon the proposition that supplying the equipment installed and the gas without providing a vent to carry off the carbon monoxide gas formed by burning the gas was under the circumstances the same as supplying a defective chattel.

The equipment was installed and the gas was furnished for the gratuitous use of Julig and the decedents on the hunting trip. After the trip they were to return the equipment and the unused gas. An uncompensated loan of a chattel for the sole benefit and use of the borrower, who is to return the specific property loaned, is a bailment for gratuitous use, in which the lender is the bailor and the borrower is the bailee. Such a bailment was created with respect to the equipment and the unused gas. The relation of the parties with respect to the gas consumed was different. A chattel consumed in use cannot be returned in specie. Where a chattel is delivered to a party for his gratuitous use with authority to consume a part of it by such use and the party is to return the part which is not consumed, there is a gift of the part which is consumed and a bailment for the gratuitous use of the bailee of the part which is to be returned. Story, Bailments (9 ed.) § 228.

The parties here stood in the relation of donors and donees with respect to the gas consumed.

A lender of a chattel for the gratuitous use of the borrower owes the latter the duty of warning him of only those defects of which the lender is aware and which might imperil the borrower by the intended use of the chattel. When a person lends he should confer a benefit and not cause a harm. Blom v. McNeal, 199 Minn. 506, 272 N. W. 599; 6 Am. Jur., Bailments, § 193; Annotations, 12 A. L. R. 793, 61 A. L. R. 1338. In some jurisdictions the rule stated has been adopted by statute. Dickason v. Dickason, 84 Mont. 52, 274 P. 145.

The gratuitous bailor is under no duty to the bailee to communicate anything which he did not in fact know, whether he ought to have known it or not. Johnson v. H. M. Bullard Co. 95 Conn. 251, 111 A. 70, 12 A. L. R. 766; Gagnon v. Dana, 69 N. H. 264, 39 A. 982, 41 L. R. A. 389, 76 A. S. R. 170. He owes the bailee no duty to take affirmative measures to see that the chattel is free from danger. Davis v. Sanderman, 225 Iowa, 1001, 282 N. W. 717. In this respect the duty of the gratuitous bailor to the bailee is like that of a landowner to a licensee. He owes him no affirmative duty of guarding and protecting him. See Mazey v. Loveland, 133 Minn. 210, 158 N. W. 44, L. R. A. 1916F, 279.

The same rules apply to donors of personal property as to gratuitous bailors. No case has been cited which directly so holds, and our limited research has failed to find any. The very reason for holding that a gratuitous bailor's duty to the bailee is limited as stated is that the loan is without compensation and benefit to the bailor. The reason obtains with as much force in the case of a gift. A gift must be accepted, if at all, in the condition offered. The dictum of Willes, J., in a case involving the question of the duty of a landowner to a licensee, Gautret v. Egerton, L. R. 2 C. P. 371, 375, that "the principle of law as to gifts is, that the giver is not responsible for damage resulting from the insecurity of the thing, unless he knew its evil character at the time, and omitted to caution the donee. There must be something like fraud on the

part of the giver before he can be made answerable," is sometimes cited in support of the views stated. Charlesworth, The Law of Negligence, p. 339. This seems to be the commonly accepted view of the rule. Winfield, The Law of Tort, pp. 570-571; Restatement, Torts, §§ 388-390, 405.

There was no duty to know or to warn such as plaintiffs claim. Their contention concedes that defendants did not know that burning the gas in the heater would give off carbon monoxide. A holding that defendants were under a duty to warn of the carbon monoxide thus formed would require them to communicate a fact of which they had no knowledge. There was no duty on the part of defendants to communicate a fact of which they were not aware. Under the rule, it makes no difference whether or not defendants would or should have discovered the fact by the exercise of due care. They were not required to take affirmative measures to protect Julig and the decedents. There was no duty to know and to warn, and hence there was no breach of duty in not knowing and not warning under the circumstances.

We have examined the cases cited by appellants and find that they are not in point. They all involve other relationships, where the supplier of the chattel was under the affirmative duty of exercising reasonable care to see that the chattel was free from any defect. In those situations the rule, which is not involved here and which we hold is inapplicable here, that a supplier is responsible for facts which he ought to know by the exercise of reasonable care, applies. Among the cited cases is Baumgartner v. Pennsylvania R. Co. 292 Pa. 106, 140 A. 622, a master and servant case. That a master is under a different duty to his servant in supplying chattels for performing his work is made clear in Symons v. G. N. Ry. Co. 208 Minn. 240, 293 N. W. 303. The other cases cited may be distinguished on the same grounds. Gobrecht v. Beckwith, 82 N. H. 415, 135 A. 20, 52 A. L. R. 858, involved the duty of a landlord to his tenants with respect to a bathroom which he maintained for their common use. The case of Smith v. S. S. Kresge Co. Inc. (8 Cir.) 79 F. (2d) 361, involved the duty

of a retailer of merchandise to a customer in which no attempt was made to show that the retailer knew or should have known the dangerous qualities of the particular articles there involved. In Alabama Utilities Service Co. v. Hammond, 225 Ala. 657, 144 So. 822, it was held that a gas company must exercise reasonable care in making adjustments on a water gas heater for a customer. The Restatement, Torts, § 388, does not support appellants' view of the rule. On the contrary, it sustains the rule as we have stated it. In comment *g* on clause *(a)* it is stated that the duty of the supplier of chattels is to exercise reasonable care to give to those who use the chattel "the information which the supplier possesses and which he should realize to be necessary to make its use safe for them."

■ Appellants contend that the loan and gift were made and that any warning to ventilate was given solely to Julig and not to decedents. The evidence permits a finding that all the decedents except Spannaus were present when Rolander warned Julig that there should be plenty of ventilation and that the door or a window should be kept open. If, however, we adopted the view that Julig was the sole bailee and donee and that he only was warned, the decedents would have participated in the use of the equipment and gas solely in virtue of Julig's rights. One who shares in the gratuitous use of a chattel by the consent of the bailee stands in no better position than the bailee with respect to his rights against the bailor. At most he is but a sharer of the bailee's gratuitous use of the borrowed chattel. *The Pegeen* (D. C.) 14 F. Supp. 748; Johnson v. H. M. Bullard Co. 95 Conn. 251, 111 A. 70, 12 A. L. R. 766, *supra;* Knapp v. Gould Auto. Co. 252 App. Div. 430, 299 N. Y. S. 688. One who shares in the use of a gift by the consent of the donee has no greater right than the donee against the donor.

If the parties were engaged in a joint enterprise, as we shall hold that the jury might have found, a warning to Julig was a warning to all.

■ The evidence made the question of joint enterprise one of fact. Each party had a common object and purpose with the others which they sought to accomplish by the coöperation of all. Each contributed his share of the expense. Each had some task in connection with the trip assigned to him. The testimony is explicit that each one of them had an equal voice in the running of the trip. There is a joint enterprise where all the parties have a community of interest in the purposes and objects of the undertaking and an equal right in its control and management. As to third persons, each member of a joint enterprise is the agent of the others, and the acts of one within the scope of the enterprise are the acts of all. Murphy v. Keating, 204 Minn. 269, 283 N. W. 389. If there was a joint enterprise, the warning to ventilate given to Julig was imputable to all. Likewise, the negligence of one was attributable to all. Hence, if one of them negligently closed the ventilator, all were charged with such negligence. Restatement, Torts, § 491.

■ The question of contributory negligence does not require extended discussion. Contributory negligence on the part of the injured party is a defense to a charge of negligence. The only question here is whether the evidence made contributory negligence a jury question. We think that it did. The evidence supports a finding that when the roof ventilator was kept open while the truck was at rest after the parties arrived at their destination up to the time they retired for the night, there was sufficient ventilation to prevent any distress or ill effects on the part of anyone. The ventilator was so constructed that it could be kept open by attaching the wire to a nail by which the flap was raised and lowered. When opened in that manner it remained open. Plaintiffs claim the flap must have blown shut during the night. But the evidence repels this explanation for the reason that the evidence is conclusive that it was a still night. Julig's doctor testified and Julig said that they left the heater on and thought they had opened the vent. That seems such a plausible explanation of

what occurred in the light of all the circumstances as to make the issue on that question one of fact for the jury.

The order should be affirmed.

Affirmed.

MR. JUSTICE STONE took no part in the consideration or decision of this case.