FEDERAL COMPRESS & WAREHOUSE COMPANY, et al. *v.* SWILLEY, et al., D.B.A. SWILLEY GIN COMPANY

No. 43180        February 1, 1965        171 So. 2d 333

*Watkins* & *Eager,* Jackson, attorneys for appellant, Federal Compress & Warehouse Company.

*Pat H. Scanlon, Young & Young,* Jackson, attorneys for appellant, J. H. Brent.

*McIntyre & McIntyre,* Brandon; *Crisler, Crisler & Bowling, Ernest Shelton,* Jackson, for appellees.

APPELLANT, FEDERAL COMPRESS AND WAREHOUSE COMPANY, IN REPLY.

APPELLANT, J. H. BRENT, IN REPLY.

GILLESPIE, J.

Swilley Gin Company obtained a joint and several judgment against Federal Compress & Warehouse Company and J. H. Brent for damages resulting from the burning of 105 bales of cotton. The defendants filed separate appeals.

W. W. Swilley and his brother, W. M. Swilley, doing business as Swilley Gin Company, and hereinafter referred to as the Gin, operate a cotton gin in Rankin County. Federal Compress & Warehouse Company, hereinafter referred to as Compress, is a corporation engaged in the compressing and storage of cotton in Hinds County. J. H. Brent, a resident of Hinds County, is an electrical contractor and is hereinafter referred to as Brent.

The Gin had sent all of its ginned cotton, with only one exception, to Compress for a period of thirty-five years. The business relationship between Compress and Gin was good, and both desired that it remain so. Gin loaded the cotton on Gin's trucks and delivered it to the Compress as fast as a truckload, twenty-eight to thirty bales, could be ginned from raw cotton and loaded for delivery. An electric hoist was used in lifting the bales of cotton from the gin platform and loading them on the trucks.

Brent had been employed by Compress as an electrician to repair or alter the electric system at its Jackson plant from time to time prior to October 17, 1961. Brent was paid by Compress on a labor and material basis

upon the completion of each particular job. He was never an employee of Compress, but an independent contractor.

Brent was never employed by Gin in any manner on this or any other occasion. His acquaintance with the Swilleys was limited to two occasions, one when Brent was shown the location of the electric hoist, and the other being October 17, 1961, the date of the fire, when Brent installed a hoist owned by Brent and told the Swilleys' that they could use it.

Several days prior to October 17, 1961, Gin began having trouble with the electric hoist. After an unsuccessful attempt by Gin to have the hoist repaired, one of the Swilleys contacted Compress with reference to the difficulties with the hoist, and Compress, through its manager, Gardner, agreed to send another hoist to Gin. This hoist was conveyed to the gin and installed by Gardner. It worked satisfactorily for several days and then it became inoperable. Gardner was notified by Gin of the difficulty with the hoist Compress had installed; whereupon Compress engaged Brent to repair either the Gin hoist or the Compress hoist so that the cotton could be loaded and moved to Compress. Brent went to the gin and repaired one of the hoists. The next day Gin again had difficulties with the hoist and called Gardner with reference thereto, and Gardner again contacted Brent. Brent advised Gardner that he was aware of the situation at the gin and suggested that he had a hoist which he would lend Gin until the other hoists could be repaired. He was then directed by Gardner to ''Please take it on out there and get it running.'' Brent installed this hoist on the morning of October 17, 1961, tested it by lifting two bales of cotton, informed Gin that it was ready for use, and departed. The proof showed without dispute that several electric wires, which ran from the rear of the gin to an outside power pole, were near the loading boom and the electric hoist which

was suspended therefrom. The testimony is in dispute whether Brent warned Gin with reference to these electric wires.

Within fifteen minutes after Brent's departure and after three or four bales of cotton had been loaded upon a truck, and while another bale was being lifted by the hoist, sparks began to come from the hoist, setting the cotton on fire, resulting in the burning of 105 bales.

After the fire, the hoist was examined by an electrician while still in place at the gin. During this examination when the hoist was put in operation, the whole thing blazed up. Thereafter the electrician inspected the capacitor, a part of the electric motor, and, according to his testimony, the insulation on one of the wires was worn out and "the insulation gave way," and a small hole was burned at the bottom of the capacitor. Based on the testimony of Lawrence, the electrician, the jury could find that the shorting of the wire with defective insulation caused the sparks to come from the motor. Lawrence further testified that the proper way to determine whether electrical equipment of this sort is in good operating condition would be to carry it to a competent electrician for inspection and repair. He also testified that the condition of the motor could have been determined by removing two screws, taking off the cap of the capacitor, and looking into it.

The day following the fire the hoist was examined by an electrician, Flannigan, along with Brent. This examination revealed, according to Flannigan and Brent, the hoist to be in good operating condition although there was a small hole in the bottom of the capacitor which appeared to them to have been burned by an electrical short or arc. They placed a charge of 1500 volts through the wiring of the hoist to determine if its insulation was proper. The wiring within the hoist withstood this excessive charge of electricity and revealed no defect in the insulation of the internal wires. A

consulting electrical engineer testified that in his opinion the hole at the bottom of the capacitor was burned from the outside to the inside as the result of the capacitor coming in contact with an uninsulated electric wire, thus causing a short or arc which burned through the hull of the capacitor, the tendency of his testimony being to prove that the hoist made contact with one of the wires leading from the gin to the power pole.

The electric hoist was given to Brent some two months prior to its installment at the gin. Upon receiving this used hoist, Brent took it to Flannigan Electric Motor Shop in the City of Jackson with instructions to put it in good running condition. The hoist was inspected, repaired, and, according to Flannigan, put in good running condition. The hull of the capacitor was not removed as it was not necessary to do so in order to repair the hoist and put it in proper condition, according to the testimony of Flannigan. After the repair Flannigan tested the hoist to establish its proper functioning by installing it on an ''A-frame'' and lifting a ton or two with it. It was found to be in good condition, and Flannigan returned it to Brent, who used the hoist once before installing it at the gin, and on that occasion it operated satisfactorily.

The electrical wires near the hoist running from the gin to the power pole were examined after the fire and the insulation was in sound and unbroken condition. This is undisputed.

The evidence is in conflict as to whether a reasonable inspection of the hoist was made before the fire. It conflicts also as to whether the fire was started by sparks originating from a short within the hoist or from the outside thereof.

Gin brought suit for damages as a result of the burning of the cotton, and charged that the defendants, as suppliers of the hoist chattel, ''knew, or by the exercise of reasonable care, should have known, that the said

electric motor installed by the defendants was defective, dangerous and hazardous and was calculated to cause fire around and about the said cotton.''

In separate briefs Brent and Compress contend that they were entitled to the peremptory charge requiring the jury to find for them.

■■ ■ We hold that the relationship between Compress and Gin was that of bailor and bailee for the mutual benefit of the parties. Compress contends that it was not a bailor, but if so, a gratuitous one.

■■■ Compress did not own the hoist and never had physical possession of it, however, it had undertaken to see that Gin be provided with a hoist, first by repairing the one owned by Gin, then providing one owned by Compress, and when both failed to work, Compress undertook to have the one owned by Brent installed for use by Gin while Brent repaired the one owned by Gin. Compress assumed dominion and control over the Brent hoist by directing Brent to install it for the purpose of use by Gin. The relationship of bailor and bailee does not depend upon who owned the bailed chattel. It may be leased to the supplier or it may be borrowed by him. Miss. Central R. Co. v. Lott, 118 Miss. 816, 80 So. 277 (1918); II Restatement, Torts § 392(c) (1934).

It cannot be successfully contended that Compress was a gratuitous bailor. It is true that it was receiving no rent for the use of the Brent hoist, but it was interested in maintaining the satisfactory business relations that had existed between it and Gin for over thirty years to the end that Gin would continue sending its cotton to Compress. And Compress had a more immediate and direct financial interest in supplying the Brent hoist to Gin in that it was to be used in loading cotton on trucks for direct shipment to Compress, for compressing and storage.

■■ ■ We also hold that the relationship between Brent and Gin was that of bailor and bailee for their

mutual benefit. Compress had employed Brent, an independent contractor, to repair the hoist owned by Gin. Brent was to be paid by Compress on a time and material basis. In carrying out his contract with Compress, Brent realized the situation at the gin — the fact that the cotton was piling up without any hoist to load it so it could be moved from the gin to Compress — and conceived the idea of lending Gin a hoist he owned. He called Gardner, Compress manager, and suggested the use of his hoist. Gardner directed Brent to take the hoist to the gin and install it, which Brent did with the assistance of his helper. It was Brent's idea to lend his hoist to Gin, and he installed it at the gin with the understanding that he would charge Compress for his and his helper's labor, plus any materials, if any, that he might use in connection with the installation. Compress expected reimbursement from Gin. Furnishing Gin the hoist and its installation constituted part of the performance of Brent's contract with Compress, the purpose of which was to get a hoist in operation at the gin. We are of the opinion that Brent had a direct and immediate financial interest in supplying the hoist to Gin, and was not a gratuitous bailor, as he contends. Brent should not be held to have a lesser degree of responsibility than Compress, for Brent was the owner and physical possessor of the hoist, and of the three parties involved in this case, the only one who had superior knowledge concerning electrical equipment, and was the only one who had the opportunity to use reasonable care to see that the hoist was reasonably safe for its intended use, and the only one who had the right to repair the hoist or have it repaired. Neither Compress nor Gin could have repaired or intelligently inspected the hoist, and Compress necessarily depended on Brent.

We are of the opinion that Robirtson v. Gulf & S. I. R. Co., 171 Miss. 628, 158 So. 350 (1935), is not in conflict

with our holding that Brent was a bailor for the mutual benefit of the parties. In that case, Robirtson was injured by defects in a railroad car furnished by the railroad company to the plaintiff's employer for the employer's intraplant use only in moving employer's products from one part of the plant to another. It was held that the railroad company was a gratuitous bailor. As noted from the foregoing statement of facts, Brent's relationship to Gin was entirely different than that of the railroad company to the creosoting company in *Robirtson.*

■■■ The next injuiry is what duty Compress and Brent owed with reference to the hoist. In accord with our own authority and the general rule, we hold that the supplier of a chattel for a use in which the supplier has a business interest owes a duty to the other to use reasonable care to see that the chattel is reasonably safe for its intended use. And the duty to use reasonable care includes the duty of reasonable inspection of the property supplied. Miss. Central R. Co. v. Lott, 118 Miss. 816, 80 So. 277 (1918); Prosser, Torts § 383 (2d ed. 1955); 8 Am. Jur. 2d *Bailments* § 51 (1963).

■■■ There is conflict in the testimony whether there was in fact a defect in the capacitor which caused the fire, and whether a reasonable inspection would have revealed the defect. These questions were resolved by the jury in Gin's favor, and but for reversible error in the instructions, the case would be affirmed.

■■■ ■■ Compress contends that it was entitled to a peremptory instruction because Brent was an independent contractor and as such supplied and installed the hoist. This argument raises the question whether Compress was relieved of responsibility because it was free to assume that Brent would use reasonable care to see that the hoist was reasonably safe for its intended use, including making an inspection thereof. Ordinarily, the employer of an independent contractor is not answer-

able for the negligence of the independent contractor, or the employees of the independent contractor, which consists of the improper manner in which the contractor or his employees perform the operative details of the work.

But there are many situations wherein the law views a duty as nondelegable because of its nature and importance. Harper and James, The Law of Torts § 26.11 (1956). No one has suggested a satisfactory criterion by which the nondelegable character of such duties may be determined. Prosser, Torts § 64 (2d ed. 1955). There are many exceptions to the general rule of nonliability. Id. at 358, 359; Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co., 201 Minn. 500, 277 N.W. 226 (1937). Some consideration should be given to the commonly known fact that cotton is a highly flammable substance and that a spark from the hoist would probably start a fire such as the one involved in this case. We are of the opinion that the duty Compress owed with reference to the hoist it supplied to Gin ought to be a nondelegable one, and we so hold. II, Restatement, Torts § 425 (1934). Weldon v. Lehmann, 226 Miss. 600, 84 So. 2d 796 (1956); Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So. 2d 770, 151 A.L.R. 631 (1944); Knell v. Morris, 39 Cal. 2d 450, 247 P. 2d 352; Brown v. Pepperdine, 23 Cal. 2d 256, 143 P. 2d 929 (1943). It is immaterial in this case whether Brent be designated an agent or independent contractor.

For the reasons stated above, Brent could not shift the responsibility for making a reasonable inspection of the hoist to Flannigan.

The plaintiff obtained an instruction on the question of liability as follows:

"The Court instructs the Jury for the Plaintiffs that if you find from a preponderance of the evidence in the case that the Defendant, Federal Compress & Warehouse Co., through its Manager, Mr. Gardner, agreed

to furnish the electric motor in question to the Plaintiffs for the purpose of expediting the cotton being delivered to the business of the said Defendant, and that the furnishing of the motor by said Defendant was in the furtherance of the business of that Defendant, then the Court instructs you that it was the duty of the Federal Compress & Warehouse Co. to exercise reasonable care to ascertain that the said motor was in a reasonably safe condition and *was not dangerous and hazardous,* and the Court instructs you *that if you believe from a preponderance of the evidence in the case that the motor was dangerous and hazardous* and was not in a reasonably good state of repair and that because thereof the fire was started, and you further believe from a preponderance of the evidence that the said Defendant did not exercise reasonable care to ascertain the condition of said motor, then the Court instructs you that you should return a verdict for the plaintiffs against the defendant, Federal Compress & Warehouse Co.

"The Court further instructs you that if you find the Defendant Federal Compress & Warehouse Co. was guilty of negligence under the above set out instruction, and you further find from a preponderance of the evidence that the Defendant appointed the defendant, J. H. Brent, as its agent to inspect, deliver and install the said motor, and *you find from a preponderance of the evidence that the said motor was dangerous and hazardous* and not in a reasonably good state of repair and that such condition, if any, resulted in the fire, and you further find from a preponderance of the evidence that the Defendant, J. H. Brent, was acting in the furtherance of the business of the Defendant Federal Compress & Warehouse Co., then the Court instructs you that your verdict should be for the plaintiffs against both Defendants." (Emphasis ours)

■ ■ This instruction is erroneous because it imposes upon Compress and Brent a duty greater than

that required by law. The instruction imposed upon defendants the duty to ascertain that the motor of the hoist was not dangerous and hazardous. This was reversible error, for the test is not whether the hoist was dangerous and hazardous but whether Compress and Brent exercised reasonable care to see that the hoist was reasonably safe for its intended use. The hoist could be dangerous and hazardous without Compress or Brent being negligent. Compress and Brent were only liable for such defects as might have been disclosed by a reasonable inspection.

■■ ■ The instruction was also erroneous in that it failed to define the terms "dangerous and hazardous" and "good state of repair" as therein used. It allowed the jury to establish its own standards for determining what was meant by these terms. The evidence on behalf of Gin justified the submission to the jury whether (1) the insulation on a wire of the capacitor gave way because it was worn out, and (2) this defect in the wiring caused the fire, and (3) said defect in the wire would have been discovered by a reasonable inspection. The part of the instruction concerned with the condition of the hoist should have thus defined and limited the issues. Cf. Meridian City Lines v. Baker, 206 Miss. 58, 39 So. 2d 541 (1949). See also list of cases involving instructions which fail to tell the jury what facts would constitute negligence cited in Gore v. Patrick, 246 Miss. 715, 150 So. 2d 169 (1963).

■■ ■ We are of the opinion that the errors in said instruction are not cured by any other instruction given the parties. Gin had the burden of establishing by evidence the existence of an actual defect which would have been disclosed upon reasonable inspection. Brookshire v. Florida Bendix Co., 163 So. 2d 881 (Fla. 1963). The instruction permitted the jury to find for the plaintiff without necessarily finding the wire in the capacitor was defective because the insulation was worn out.

We have carefully considered the contention raised by Brent that he was entitled to a change of venue and we are of the opinion that this assignment of error does not contain merit.

For the reasons stated, the case is reversed as to both Compress and Brent and remanded for a new trial.

Reversed and remanded.

All Justices concur, except *Ethridge and Patterson, JJ.,* who dissent in part.

PATTERSON, J., dissenting in part — concurring in part.

I dissent from the opinion of the majority as it is my opinion that the relationship between Brent and the Gin was that of a gratuitous bailment with the attendant duty of the gratuitous bailor to warn the bailee of any known defects in the bailed chattel. I concur in the result as to Compress.

In regard to the former, I note that Brent was an independent electrical contractor; that he was hired by Compress to repair the defective hoist; that he was to be paid by Compress on a labor and material basis, as he had been paid in the past, for the performance of specific tasks. He was a business stranger to the owners of the Gin, had never been hired by them and expected no pay from them. From the entire record I can detect neither tangible nor conjectural hope of remuneration or reward to Brent from the Gin for either his services or the use of his hoist, the use of the hoist as between these two being for the benefit of the Gin only. Under these facts I am of the opinion that Brent was a gratuitous bailor to the Gin. See 8 Am. Jur. 2d *Bailments* sec. 15 (1963) as follows: ''The general rules for distinguishing a bailment for hire from a bailment for the sole benefit of the bailor are for the most part applicable in differentiating such a bailment from one for the sole benefit of the bailee . . . .

''A bailment for mutual benefit arises when both parties to the bailment receive a benefit from the trans-

action although no actual money or other consideration passes, as where the bailment or loan of an article is motivated by the bailor's desire to promote a sale of it by the bailee. But to create a bailment for mutual benefits in a business transaction, the reward of the bailor must be found to arise out of hope of tangible remuneration from the transaction then being consummated, or it must be shown that the bailor has held out to the public in general a firm offer that in consideration of the business to be transacted he would create a benefit for a bailee.'' See *Robirtson v. Gulf & S. I. R. Co.,* 171 Miss. 628, 158 So. 350 (1935), a suit by an employee of a creosoting company against the railroad who furnished the company a defective car, the defect causing his injury, wherein it stated: ''The purpose for which the railroad car was being used at the time of appellant's injury was one incident solely to the business of the creosoting company. . . . It does not appear from the averments of the declaration that the particular use made of the car by the creosoting company, that is, its use in a strictly intraplant movement of his products for convenient storage for ultimate shipment was any way connected with, or in aid of, appellee's business of transporting such products at such future time as the business of the creosoting company required. . . . We think this charge, when taken in connection with all the averments of the declaration as to the business relations between the appellees and the creosoting company, is too indefinite and sets forth facts *too remote* to constitute a business interest on the part of the appellees in the mere intra-plant movement of the creosoting company's products.'' (Emphasis ours.) Appellee cites no authority to the effect that Brent is other than a gratuitous bailor nor does he argue to the contrary.

A gratuitous bailor owes only a duty to his bailee to warn of known defects in the instrument or thing fur-

nished to the bailee. *Robirtson supra; Ruth v. Hutchinson Gas Co.,* 209 Minn. 248, 296 NW 136 (1941); *Blom v. McNeal,* 199 Minn. 506, 272 NW 599 (1937); and Prosser *Torts* sec. 84, at 513 (2d ed. 1955), wherein he states, ''The cases which have dealt with gratuitous lenders and bailors have held that there is no greater obligation toward a third person than to the immediate bailee. The bailor is therefore under no duty to inspect the chattel before delivering it, and the bailee assumes the full responsibility for its condition. There is liability only for a failure to disclose defects of which the bailor has knowledge which may render it dangerous to others.'' And 8 C.J.S. *Bailments* sec. 25(b), at 386 (1962), ''As a general rule, the only duty which a gratuitous bailor owed either to the bailee or to third persons is to warn them of known defects which render the bailed chattel dangerous for the purpose for which it is ordinarily used.'' There being no evidence by the plaintiff that Brent knew of any defect in the hoist and no evidence from which a reasonable inference could be drawn that he knew thereof which would support a verdict for the Gin as against Brent, the motion for a directed verdict by Brent at the close of plaintiffs' testimony should have been sustained. *Clark v. Luther McGill,* 240 Miss. 509, 127 So. 2d 858 (1961); and *Williamson v. Inzer,* 239 Miss. 707, 125 So. 2d 77 (1961). I am of the opinion the court erred in overruling Brent's motion for a peremptory instruction.

The majority opinion states that Brent should not be held to a lesser degree of responsibility than Compress. Unfortunately, no authorities are cited to establish this same degree of responsibility with Compress, and those which hold differently, with deference, are not followed. *Robirtson* is cited by the majority as being no obstacle in the path of the ''same degree of responsibility'' conclusion. I cite it as being squarely in point and authority for Brent's legal position as a gratuitous

bailor with a lesser degree of responsibility to the Gin than Compress. The controlling opinion asserts, however, that Brent's relationship to the Gin was entirely different from that of the railroad company to the creosoting company in *Robirtson*. It is different and this difference strengthens Brent's gratuitous position. In *Robirtson* the railroad, which supplied a defective car, had hope of ultimate future reward by way of increased business as the result of the use of the car. This Court held this hope of reward was too remote to hold the railroad to be other than a gratuitous bailor. Here Brent had no hope of reward whatsoever, either remote or otherwise, from the Gin and thus the case is actually authority for his position as a gratuitous bailor. It is my opinion that the principles announced in *Robirtson* should be followed, as I do not see how it can with logic be distinguished from the case at bar.

The opinion of the majority suggests "that Brent had a direct and immediate financial interest in supplying the hoist to Gin. . . ." Assuming this to be true, the financial interest of Brent was still to be paid by Compress and not by Gin as is positively reflected by the record, therefore, their relationship was not altered.

The majority suggests also that Brent as the owner and physical possessor of the hoist, and being an electrician, was the only one who had opportunity to use reasonable care to see that the hoist was reasonably safe for its intended use and the only one who had the right to repair the hoist or have it repaired. I disagree as I do not believe the facts warrant this assumption. The evidence reflects that Brent was an electrician, but it also reflects that he obtained the services of an electrician skilled in electric motors, Flannigan, to repair the hoist. Whether this was done due to his own inability, for convenience, or for whatever reason, the fact remains that Brent was not shown to be a person of superior knowledge as to electric motors; if anything,

the inference would seemingly be to the contrary as he hired another to do this work for him. To assume, as the majority does, that Brent was the only one who had the opportunity or right to use reasonable care to see that the hoist was reasonably safe for its intended use is erroneous. The majority imposes a duty of reasonable inspection upon Compress and they must therefore confer therewith the right to perform that duty. Lex non cogit ad impossibilia. Here the majority states that Compress owes the duty of reasonable inspection and yet it withholds from it the right of inspection, thus creating a legal paradox in which I cannot concur, especially in view of the statement of the majority, "Compress assumed dominion and control over the Brent hoist. . . ."

I concur in the result as to Compress, as I am of the opinion that the question of reasonable inspection and the related question of whether a reasonable inspection would have disclosed the defect, and whether the defect caused the injury, was one for the jury to pass upon under proper instructions.

The duty owed by a bailor to his bailee when the bailment is for their mutual benefit is expressed in 8 C.J.S. *Bailments* sec. 25, at 384 (1962), as follows: "A bailor has the duty to use ordinary, due or reasonable care to furnish chattels which are reasonably fit for the purposes of the bailment, or capable of the use, known or intended, for which they are bailed. . . . To this end the bailor must use reasonable care to inspect or examine the chattel before delivering it to the bailee, particularly where it was made by a third person. Under other authorities, the bailor owes a duty to the bailee and to third persons to make the chattel safe for the use to which it is to be put, or to give warnings of the danger of which he knows, and to make any reasonable inspection of the chattel to ascertain any defect or dangerous conditions." And in *Minicozzi v. The Atlantic*

*Refining Co.,* 143 Conn. 226, 120 A. 2d 924, 926 (1956) the court in discussing the duties of one who supplies personalty to another for use in which the supplier had a business interest made this statement: "It is a well-established principle of law that one who supplies tangible personal property to another for a use in which the supplier has a business interest owes a duty to the other to use reasonable care to see that the property supplied is safe for its intended use. Prosser, *Torts* (2d Ed.) pp. 491, 492; Restatement, Torts § 392. This duty to exercise reasonable care includes the duty of reasonable inspection of the property supplied. Restatement, 2 Torts § 392, comment b; see Cavanaugh v. Windsor Cut Stone Corporation, 80 Conn. 585, 590, 69 A. 345; Rincicotti v. John J. O'Brien Contracting Co., 77 Conn. 617, 620, 60 A. 115, 69 L.R.A. 936," and *McNeal v. Greenberg,* 40 Cal. 2d 740, 255 P. 2d 810 (1953), and finally, the case of *Mississippi Central Railroad v. Lott,* 118 Miss. 816, 80 So. 277 (1918) in which this Court in considering a case similar to the one at hand reduced the same to this cogent point on page 829 thereof: "The jury has said by their verdict that the car was in fact defective. The important inquiry then, as we view the case, is whether the defective condition of the car could have been discovered by reasonable inspection. On this question there was a dispute in the testimony, and all doubts or conflicts in the evidence have been resolved in favor of the plaintiff, and on this point we see no reason to disturb the verdict of the jury." There being evidence that the inspection relied upon by Compress was not reasonable, I am of the opinion the court below did not err in overruling the motion of Compress for a peremptory instruction.

The case should be reversed and rendered as to Brent and reversed and remanded for a new trial as to Compress.

ETHRIDGE, J. joins in this dissent.